# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant DXC TECHNOLOGY COMPANY,<br><br>       Plaintiff,<br><br>  v.<br><br>DAVID L. HERZOG, RAUL J. FERNANDEZ, DAVID A. BARNES, ANTHONY GONZALEZ, PINKIE MAYFIELD, KARL RACINE, DAWN ROGERS, CARRIE TEFFNER, AKIHIKO WASHINGTON, ROBERT F. WOODS, ROBERT F. DEL BENE, MICHAEL J. SALVINO, KENNETH P. SHARP, and JOHN SWEENEY,<br><br>       Defendants,<br><br>  and<br><br>DXC TECHNOLOGY COMPANY,<br><br>       Nominal Defendant. | Case No. 1:24-cv-01521<br><br>JURY TRIAL DEMANDED |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant DXC Technology Company ("DXC" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters,

1

based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding DXC, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of DXC against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between May 26, 2021 and May 16, 2024, inclusive (the "Relevant Period").

2.      DXC is a multinational information technology services and consulting company that operates through two segments: Global Business Services ("GBS") and Global Infrastructure Services ("GIS"). The GBS segment offers services including analytics and engineering, insurance software, and business process and enterprise application strategy services. The GIS segment's portfolio of technology offerings includes technology security, cloud infrastructure and information technology outsourcing services.

3.      In DXC's 2020 Annual Report, dated June 1, 2020, the Company detailed a "transformation journey" that it had begun to position DXC for the future. Specifically, in a letter to shareholders included in the annual report, then-Chief Executive Officer ("CEO") Defendant Michael J. Salvino ("Salvino") stated:

Our **transformation journey** focuses on three things: **strengthening our customer relationships** and ensuring we are delivering for our customers; **optimizing costs** to better serve our customers by eliminating confusion and complexity; and **seizing the market opportunity** by cross-selling and expanding what we do with our customers across the Enterprise Technology Stack.

4.     However, throughout the Relevant Period, the Individual Defendants made or caused the Company to make statements materially false and misleading representations concerning the transformation journey, as well as and the Company's ability to integrate previously acquired companies and business systems. While DXC was touting its success in implementing the "transformation journey," it was truly only able to reduce its restructuring and transaction, separation, and integration ("TSI") costs by curbing the Company-wide "transformation" and limiting its integration efforts, thereby simply deferring costs that DXC would ultimately need to spend to finally implement the restructuring.

5.     On August 3, 2022, investors began to learn the truth when, during an earnings call, the Company reported disappointing financial results. During the call, then-Chief Financial Officer ("CFO") Kenneth P. Sharp ("Sharp") explained that "our cost optimization efforts have moved at a slower pace than anticipated as we were thoughtfully building our plan."

6.     Finally, on May 16, 2024, the Company admitted that "the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth" because systems were "never integrated, never deduped" but were rather a "number of business processes that got stacked on top of each other; [a] number of legal entities." Additionally, the Company announced it would need to spend an additional $250 million to achieve the restructuring and integration process.

7.     On this news, the price of DXC stock dropped nearly 17%, $3.36 per share, from a closing price of $19.88 per share on May 16, 2024, to a closing price of $16.52 per share on May

17, 2024.

8.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, concerning the progress and success of DXC's transformation journey. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

9.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.     As a result of the foregoing, a securities fraud class action was filed against the Company, CFO Robert F. Del Bene ("Del Bene"), former CEO and Chairman of the Board Salvino, former CFO Sharp, and former Vice President of Investor Relations John Sweeney ("Sweeney") captioned *Roofers' Pension Fund v. DXC Technology Company et al*, Docket No. 1:24-cv-01351 (E.D. Va. Aug 02, 2024) (the "Securities Class Action"). The Securities Class Action has exposed the Company to massive class-wide liability.

11.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

12.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of DXC's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant DXC is headquartered in this District, conducts business in this District, and

several of the acts and omissions charged herein occurred in substantial part in this District.

## PARTIES

*Plaintiff*

18.     Plaintiff is and has been a continuous shareholder of DXC common stock since at least October 2020.

*Nominal Defendant*

19.     Nominal Defendant DXC is incorporated under the laws of Nevada, with its principal executive offices located in Ashburn, Virginia. DXC's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC."

*Individual Defendants*

20.     Defendant David L. Herzog ("Herzog") has served as Chairman of the Company's Board since December 2023, and as a member of the Board since April 2017. Defendant Herzog also serves as a member of the Board's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. As set forth in the proxy statement filed by DXC with the SEC on June 14, 2024 ("the 2024 Proxy"), Herzog received $692,217 in compensation from the Company in fiscal year 2024.[1]

21.     Defendant Raul J. Fernandez ("Fernandez") has served as DXC's President and CEO since February 1, 2024, after serving as DXC's Interim President and CEO since December 2023. Defendant Fernandez has served as a member of the Board since August 2020. According to the 2024 Proxy, Fernandez received a total of $9,666,663 in compensation from the Company in fiscal year 2024 for his service as a non-employee director until his appointment as Interim

---

[1] DXC's fiscal year ends on March 31 of each year.

President and CEO, as well as for his role as CEO.

22.     Defendant David A. Barnes ("Barnes") has served as a member of the Board since August 2020. Defendant Barnes also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2024 Proxy, Barnes received a total of $378,163 in compensation from the Company in fiscal year 2024.

23.     Defendant Anthony Gonzalez ("Gonzalez") has served as a member of the Board since January 2023. Defendant Gonzalez also serves as a member of the Board's Compensation Committee. According to the 2024 Proxy, Gonzalez received a total of $356,942 in compensation from the Company in fiscal year 2024.

24.     Defendant Pinkie Mayfield ("Mayfield") has served as a member of the Board since July 2023. Defendant Mayfield also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy, Mayfield received a total of $325,279 in compensation from the Company in fiscal year 2024.

25.     Defendant Karl Racine ("Racine") has served as a member of the Board since January 2023. Defendant Racine also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy, Racine received a total of $362,098 in compensation from the Company in fiscal year 2024.

26.     Defendant Dawn Rogers ("Rogers") has served as a member of the Board since March 2021. Defendant Rogers also serves as a member of the Board's Compensation Committee. According to the 2024 Proxy, Rogers received a total of $362,410 in compensation from the Company in fiscal year 2024.

27.     Defendant Carrie Teffner ("Teffner") has served as a member of the Board since April 2022. Defendant Teffner also serves as a member of the Board's Audit Committee.

According to the 2024 Proxy, Teffner received a total of $364,098 in compensation from the Company in fiscal year 2024.

28.     Defendant Akihiko Washington ("Washington") has served as a member of the Board since March 2021. Defendant Washington also serves as Chair of the Board's Compensation Committee. According to the 2024 Proxy, Washington received a total of $391,098 in compensation from the Company in fiscal year 2024.

29.     Defendant Robert F. Woods ("Woods") has served as a member of the Board since April 2017. Defendant Woods also serves as Chair of the Board's Audit Committee. According to the 2024 Proxy, Woods received a total of $396,419 in compensation from the Company in fiscal year 2024.

30.     Defendant Del Bene has served as the Company's Executive Vice President and CFO since June 2023. According to the 2024 Proxy, Del Bene received a total of $6,167,056 in compensation from the Company in fiscal year 2024. Defendant Del Bene is also named as a defendant in the Securities Class Action.

31.     Defendant Salvino served as the Company's President and CEO from September 2019 to December 2023, and served as a member of the Board from May 2019 to December 2023. According to the 2024 Proxy, Salvino received a total of $19,821,384 in compensation from the Company in fiscal year 2024. Defendant Salvino is also named as a defendant in the Securities Class Action.

32.     Defendant Sharp served as DXC's Executive Vice President and CFO from November 30, 2020, through June 1, 2023. According to the 2024 Proxy, Sharp received a total of $1,994,548 in compensation from the Company in fiscal year 2024. Defendant Sharp is also named as a defendant in the Securities Class Action.

33.     Defendant Sweeney served as DXC's Vice President of Investor Relations from January 2021 through June 2024. Defendant Sweeney is also named as a defendant in the Securities Class Action.

34.     Defendants referenced in paragraphs 20 through 33 are herein referred to as the "Individual Defendants."

35.     The Individual Defendants, together with DXC, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers and/or directors of DXC, and because of their ability to control the business and corporate affairs of DXC, the Individual Defendants owed DXC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DXC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of DXC and its shareholders so as to benefit all shareholders equally.

37.     Each director and officer of the Company owes to DXC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of DXC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of DXC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

9

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of DXC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42.     To discharge their duties, the officers and directors of DXC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of DXC were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Virginia and the United States, and pursuant to DXC's own Code of Conduct and Corporate Governance Guidelines;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how DXC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of DXC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DXC's operations would comply with all applicable laws and DXC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial

11

information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

43.     Each of the Individual Defendants further owed to DXC and the shareholders the duty of loyalty requiring that each favor DXC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44.     At all times relevant hereto, the Individual Defendants were the agents of each other and of DXC and were at all times acting within the course and scope of such agency.

45.     Because of their advisory, executive, managerial, and directorial positions with DXC, each of the Individual Defendants had access to adverse, non-public information about the Company.

46.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DXC.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

49.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

50.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of DXC, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of DXC and at all times acted within the course and scope of such agency.

### DXC'S CODE OF CONDUCT AND CORPORATE GOVERNANCE GUIDELINES

53.    DXC's Code of Conduct applies to all directors, officers, executives, employees and representatives of DXC, and states that it is designed as a "practical guide that helps us identify and understand ethical and legal compliance considerations that may arise in our work."

54.    In a section titled "Delivering excellence for our investors," the Code of Conduct guides employees to "keep accurate records so we can operate effectively and provide timely,

truthful and valuable information to those who rely on it." The Code of Conduct further states: "Keeping accurate records is essential to fulfilling our regulatory obligations as a public company. Investors and other stakeholders are entitled to rely on truthful and complete disclosures about our financial and operational performance."

55.     In a section concerning conflicts of interest, the Code of Conduct states, in relevant part:

**Values and culture**

DXC's values demand that we always do the right thing. We never give even the appearance of anything improper.

**Customers and business**

We base our business decisions and actions on full information, thorough preparation and objective criteria.

**Trust and reputation**

Acting honestly, transparently and reliably builds trust and helps sustain the delivery of excellence.

56.     The Company's Corporate Governance Guidelines state that directors "have a duty to act in good faith and with a view to the interests of the Company."

## DXC'S AUDIT COMMITTEE CHARTER

57.     DXC's Audit Committee Charter states that the role of the Audit Committee is to:

(1)     to oversee the accounting, financial reporting processes and related internal control framework of the Company and audits of the Company's financial statements and internal control over financial reporting;

(2)     to assist the Board of Directors in its oversight of:

    (a) the integrity of the Company's financial statements,

    (b) the Company's compliance with legal and regulatory requirements,

    (c) the independent auditor's qualifications and independence, and

    (d) the performance of the Company's internal audit function and

independent auditor; and

(3)     to prepare a report of the Committee as required by the Securities and Exchange Commission to be included in the Company's annual proxy statement.

58.     With respect to the Audit Committee's responsibilities, the Audit Committee

Charter states, in relevant part:

In accordance with Section 10A of the Securities Exchange Act of 1934, the Committee shall preapprove all auditing services and non-audit services (other than prohibited non-audit services, and other than permitted de minimis non-audit services) provided by the independent auditor. If the Committee delegates its preapproval authority hereunder, such authority shall only be delegated to one or more members of the Committee, and the decisions of any Committee member to whom such authority is delegated must be presented to the full Committee at its next scheduled meeting.

59.     The Audit Committee Charter further provides:

(5)     At least annually, the Committee shall obtain and review a report by the independent auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the independent auditor and the Company.

*                    *                    *

(7)     The Committee shall meet to review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(8)     The Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

(9)     The Committee shall discuss the Company's policies with respect to risk assessment and risk management.

(10)    The Committee shall meet separately, periodically, with management, with

15

the internal auditor (or other personnel responsible for the internal audit function) and with the independent auditor.

(11)   The Committee shall review with the independent auditor any audit problems (including any significant disagreements with management) or difficulties (including any restrictions on the scope of the independent auditor's activities or on access to requested information), and management's response. The review should also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

*          *          *

(14)   The Committee shall review with the Board of Directors any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function.

(15)   The Committee shall prepare a report of the Committee as required by the Securities and Exchange Commission to be included in the Company's annual proxy statement.

60.   With respect to the Company's risk and risk management, the Audit Committee

Charter states, in relevant part:

(17)   The Committee shall oversee and review with management the Company's enterprise risk management framework, addressing the Company's exposure across the range of operational risk, brand/reputational risk, strategic risk, compliance risk, and other risk categories as appropriate.

(18)   The Committee shall oversee the development and implementation of the Company's risk management program, which includes establishing the Company's risk appetite; aligning risk appetite with strategy and operations; defining the policies and processes for risk identification, assessment and mitigation; and monitoring evolving risks and mitigation effectiveness.

(19)   The Committee shall oversee the Company's risk management practices relating to conformance with industry-specific regulatory compliance standards, such as those applicable to the Banking and Capital Markets industries.

(20)   The Committee shall provide oversight for the Company's ethics and compliance program, including a review of the Company's policies and

procedures for ensuring compliance with the Company's Code of Conduct and the promotion of Company values. The Committee shall approve material changes to the Code of Conduct.

## SUBSTANTIVE ALLEGATIONS

### *Materially False and Misleading Statements*

61.     On May 26, 2021, the Company held an earnings conference call with analysts and investors to discuss fourth quarter and full fiscal year 2021 results. During the call, Defendant Salvino highlighted "the progress we are making on our transformation journey" and stated that "[w]e have achieved our goal of $550 million of cost savings in FY 2021. . . . We have done well optimizing our costs and continuing to deliver for our customers without disruption." Also on the call, Defendant Sharp stated "[o]ne of our key initiatives, we are employing to drive cash flow and improve earnings power is to wind down restructuring and TSI costs."

62.     On June 17, 2021, the Company held its annual Investor Day. Defendants Sharp, Sweeney, and Salvino were present at the event. Defendant Sharp stated "we are working to build a stronger financial foundation and drive the company in a disciplined and rigorous fashion to unleash our true earnings power." Sharp also added that the Company had "an unyielding focus on reducing restructuring and TSI expenditures," and "[o]ne of our key initiatives we are employing to improve the earnings power and ultimately drive free cash flow is to wind down our restructuring and TSI expenditures."

63.     On August 4, 2021, the Company held a conference call with analysts and investors to discuss first quarter of 2022 results. During the call, Defendant Sharp stated "[o]ne of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring and TSI cost." Defendant Sharp also stated "we will continue to make decisions to better position the company for the longer-term, creating a sustainable business."

64.     On September 14, 2021, Defendant Salvino attended the Citi Global Technology Conference. In response to a question about how DXC's current restructuring differed from prior restructuring efforts at DXC, Defendant Salvino stated "[w]e're running a very structured playbook . . . now, we're in building the foundation for growth. Meaning, simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there." Defendant Salvino also added, "[e]very quarter, we continue to adjust the thinking of our business in terms of long-term stuff. So, when you look at what we did, again, with free cash flow last quarter, we dealt with stuff that long-term is going to put us in a much, much better situation."

65.     On November 3, 2021, the Company hosted an earnings call with analysts and investors to discuss second quarter 2022 results. During the call, Defendant Sharp stated "[a] key driver of improving cash flow is to continue to reduce our restructuring and TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business. . . . We remain on track to reduce restructuring in TSI from an average of $900 million per year over the last four years to $550 million in FY 2022 and about $100 million in FY 2024." Also during the call, Defendant Salvino represented that reducing costs, including "shrinking restructuring and TSI costs" were "all sustainable and a result of the operational work we are doing. This gives us confidence that we will achieve our FY 2024 double-digit margin guidance."

66.     On June 6, 2022, Defendant Sweeney attended the Baird Global Consumer, Technology, and Service Conference, stating: "I'm going to take you through how DXC has been executing on the goals of its transformation journey. The company's made significant progress over the past couple of years and it's now delivering strong financial results . . . we're just getting started. We think our solid financial performance and our improving business trajectory is going to continue for years to come based on how we currently manage the business." Defendant

Sweeney also added, "in FY 2022, you can really see the financial results of our transformation journey" which "has changed the entire trajectory of the business. . . . [I]t's the execution of this program that stabilized DXC, and we believe, this is going to be our blueprint for future growth."

67.     Also at the Baird Global Consumer, Technology, and Service Conference, Defendant Sweeney stated "[t]hroughout the transformation journey, we've instilled financial discipline; we strengthened the balance sheet; we've improved cash generation, capital efficiency; we've lowered, we used to have $1 billion a year spend in restructuring TSI . . . [w]e continue to reduce our quarterly restructuring, transaction, separation and integration expense." Defendant Sweeney also stated:

> [G]ot [] restructuring under control. In FY 2022, we reduced restructuring [and] TSI by $550 million in spending . . . and that's sustainable, too . . . [q]uarter in, quarter out, we were wading through all the sins of the past, and I think the real reason we've been able to do this is because we're down in the details and we're managing everything at a very low level. As we continue to work on a transformation journey, we believe that the structural changes we put in place and the ongoing focus we put at DXC are going to help us to generate and to hold on to more cash.

68.     The statements detailed above were materially false and misleading, and omitted material facts, in that they failed to disclose that the Company had reduced restructuring and TSI costs by curbing the Company-wide "transformation" and had thereby simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring that it claimed to be successfully addressing.

***The Truth Emerges***

69.     The truth began to emerge on August 3, 2022, when the Company held a conference call with analysts and investors to discuss first quarter 2023 results. During the call, Defendant Sharp explained that "our cost optimization efforts have moved at a slower pace than anticipated as we were thoughtfully building our plan."

19

70.     On this news, the price of DXC common stock declined by 17%, or $5.37 per share, from a close of $31.52 per share on August 3, 2022, to a closing price of $26.15 per share on August 4, 2022.

71.     The Individual Defendants, however, continued to make or cause the Company to make false and misleading statements concerning the transformation and reduction in restructuring and TSI costs.

72.     On February 1, 2023, the Company hosted a conference call with analysts and investors to discuss third quarter 2023 results. During the call, Defendant Sharp responded to a question concerning the factors which drove the Company's strong quarterly performance by stating, "[t]he biggest driver, right, if you had to just kind of look holistically at the business, has been the focus on driving down the restructuring and TSI. So I think that's been somewhere around $600 million swing year-to-year. So I think that's a pretty big piece."

73.     On August 2, 2023, the Company hosted a conference call with analysts and investors to discuss first quarter 2024 results. During the call, Defendant Salvino stated "[w]e are managing areas that we can control very well, like free cash flow and restructuring and TSI." Also during the call, Defendant Del Bene added: "We continued to tightly manage restructuring and TSI expense, which was $21 million in the first quarter."

74.     On November 1, 2023, the Company hosted a conference call with analysts and investors to discuss second quarter 2024 results. During the call, Defendant Salvino stated "[a]s you have heard consistently from us over the last several quarters, our management team is laser-focused on transitioning DXC from stability to higher performance." Also during the call, Defendant Salvino added: "We obviously are pretty excited about our execution. Our execution was aligned with our expectations, and in some cases, even better."

75.     The statements detailed above, made between August 3, 2022 and November 1, 2023, were materially false and misleading, and omitted material facts, in that they failed to disclose that the Company had reduced restructuring and TSI costs by curbing the Company-wide "transformation" and had thereby simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring that it claimed to be successfully addressing.

76.     On December 20, 2023, the Company issued a press release announcing that Defendant Salvino, the Company's CEO and Chairman of the Board, had left DXC, effective December 18, 2023. The press release advised: "In mutual agreement with the Board, [Salvino] will transition from his role as Chairman of the Board, effective immediately, and will remain in an advisory role until March 31, 2024 to help ensure a seamless transition." The press release further stated that Defendant Fernandez would succeed Salvino as Interim President and Chief Executive Officer, effective immediately, and Lead Independent Director, Defendant Herzog, had been named Chairman of the Board.

77.     On this news, the price of DXC common stock declined by 12%, or $3.04 per share, from a close of $25.03 per share on December 19, 2023, to a closing price of $21.99 per share on December 20, 2023.

78.     Yet still, the Individual Defendants continued to make, or cause the Company to make, materially false and misleading statements concerning the transformation and reduction in restructuring and TSI costs.

79.     On March 4, 2024, Defendant Del Bene attended the Morgan Stanley Technology, Media & Telecom Conference. During the conference, in response to a question from an analyst regarding the key takeaways for investors, Defendant Del Bene stated that the "lack of integration of the companies that were the basis of the formation of DXC. So, as we integrate over time, we

expect to improve our KPIs on the infrastructure as well. So not only implementing very strong dashboards and metrics for the individual business units, but the support organizations as well. And we think both of those are going to drive value for us."

80.    Defendant Del Bene's statements at the March 4, 2024 Morgan Stanley Technology, Media & Telecom Conference were materially false and misleading, and omitted material facts, in that they failed to disclose that the Company had reduced restructuring and TSI costs by curbing the Company-wide "transformation" and had thereby simply deferred costs that DXC would ultimately need to spend to finally implement the restructuring that it claimed to have addressed.

81.    On May 16, 2024, the Company held a conference call with analysts and investors to discuss fourth quarter and full fiscal year 2024 results. During the call, Defendant Fernandez stated that, after having "really spent a lot of time operationally looking at our systems, [and] our processes" it was clear that "the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth" because, despite a years-long integration effort, systems were "never integrated, never deduped" but were rather a "number of business processes that got stacked on top of each other; [a] number of legal entities." Additionally, the Company announced it was undertaking a "real reset" from the "bottom up" that was "absolutely needed, because otherwise, we'd just continue to carry a really not fully functional organization."

82.    Also on the May 16, 2024 conference call, DXC revealed it would need to spend an additional $250 million to achieve the restructuring and integration process.

83.    On this news, the price of DXC stock declined $3.36 per share, or nearly 17%, from a closing price of $19.88 per share on May 16, 2024, to a closing price of $16.52 per share on May 17, 2024.

*Harm to the Company*

84.     As a direct and proximate result of the Individual Defendants' misconduct, DXC has lost and expended, and will lose and expend, millions of dollars.

85.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

86.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

87.     Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

88.     As a direct and proximate result of the Individual Defendants' conduct, DXC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

90.     DXC is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

91.     Plaintiff is an owner of DXC common stock and has been a continuous shareholder of Company stock at all relevant times.

92.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

93.     A pre-suit demand on the Board of DXC is futile and, therefore, excused. At the time this action was commenced, the ten-member Board consisted of Individual Defendants Herzog, Fernandez, Barnes, Gonzalez, Mayfield, Racine, Rogers, Teffner, Washington, and Wood (the "Director Defendants"). As set forth below, all ten Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

94.     The acts complained of herein constitute violations of fiduciary duties owed by DXC's officers and directors, and these acts are incapable of ratification.

95.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

96.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

97.     Each of the Director Defendants authorized and/or permitted false statements to be

disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

98.     Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

99.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

100.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

101.     Defendants Herzog, Barnes, Teffner, and Woods (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting, as well as the effectiveness of the Company's policies and procedures. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as

alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

102.    Further, the Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

## **COUNT I**

### **Against The Individual Defendants For Violations of § 10(b) of the Exchange Act and Rule 10b-5**

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

105.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

107.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of DXC were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

108.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of DXC, their control over, and/or receipt and/or modification of DXC's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning DXC, participated in the fraudulent scheme alleged herein.

109.    As a result of the foregoing, the market price of DXC common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of DXC common stock in purchasing DXC common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

110.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the

Securities Class Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

113.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

114.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.     Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, concerning the progress and success of DXC's transformation journey. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

116.     In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

117.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

118.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

119.     Plaintiff, on behalf of DXC, has no adequate remedy at law.

## COUNT III

### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

120.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged,

facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

122.    Plaintiff on behalf of DXC, has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Unjust Enrichment

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DXC.

125.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from DXC that was tied to the performance or artificially inflated valuation of DXC or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

126.    Plaintiff, as a shareholder and a representative of DXC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

127.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

130.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

131.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

132.    Plaintiff, on behalf DXC, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of DXC and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing DXC to take all necessary actions to reform and improve its corporate

governance and internal procedures to protect DXC and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: August 29, 2024

**LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant DXC TECHNOLOGY COMPANY**

By: */s/ David G. Browne*
     David G. Browne (VSB No. 65306)

Of Counsel:

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky, Esq.
Gina M. Serra, Esq.
Herbert W. Mondros, Esq.
1007 North Orange Street
Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085

Spiro & Browne PLC
2400 Old Brick Road
Glen Allen, Virginia 23060
Telephone: (804) 573-9220
Facsimile: (804) 836-1855
Email: dbrowne@sblawva.com

*Attorneys for Plaintiff*